IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JAMES HENRY ADUDDLE, | § | |
| TDCJ-CID NO.1191046, | § | |
|     Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. H-04-2867 |
| | § | |
| FORT BEND COUNTY, *et al.*, | § | |
|     Defendants. | § | |

OPINION ON DISMISSAL

Plaintiff James Henry Aduddle, an inmate incarcerated in the Fort Bend County, Texas Jail, proceeding *pro se* and *in forma pauperis*, filed this civil rights complaint alleging that defendants withheld medical care for his injured hand. For the reasons to follow, the Court will grant defendants' motion for summary judgment and dismiss plaintiff's complaint.

I. BACKGROUND

According to plaintiff, the following events precipitated the filing of the pending civil rights complaint: On July 24, 2002, he was shot five times by Sugar Land police officers. (Docket Entry No.1). One of the bullets hit his left hand and shattered the bones of his middle and ring fingers. (*Id.*). Doctors at a local hospital, where his hand was initially treated, instructed Fort Bend County Jail officials to bring him back to the hospital in six weeks for surgery. (*Id.*). Six weeks later, he complained to Nurse Johnson and other nurses that no action had been taken on the doctor's instruction. (*Id.*). Johnson told him that they were working on the situation. (*Id.*). Twelve weeks later, he was taken to a local orthopedic doctor, who informed him that medical attention had been withheld too long and that he could lose the use of his fingers. (*Id.*). The surgeon also told him that he would need plastic surgery to repair his hand because scar tissue had formed around the injury. (*Id.*). Nurse Johnson told him that Fort Bend County would not pay for plastic surgery. (*Id.*) He

has lost the use of the middle and ring fingers on his hand and now suffers great pain from the injury. (*Id.*). Physicians at the Texas Department of Criminal Justice have told him that nothing can be done at this point to restore his hand. (*Id.*).

Plaintiff seeks compensatory and punitive relief against defendants Fort Bend County, Texas and Fort Bend County Sheriff Milton Wright. (*Id.*).

Defendants move for summary judgment on the following grounds:

1. Defendants were not deliberately indifferent to plaintiff's serious medical needs,

2. Sheriff Milton Wright was not personally involved in the alleged deprivation of medical care;

3. Sheriff Wright is entitled to qualified immunity; and,

4. Plaintiff fails to state facts that establish Fort Bend County's liability under 42 U.S.C. § 1983.

(Docket Entry No.15).

## II. STANDARD OF REVIEW

To be entitled to summary judgment, the pleadings and summary judgment evidence must show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The moving party bears the burden of initially pointing out to the court the basis of the motion and identifying the portions of the record demonstrating the absence of a genuine issue for trial. *Duckett v. City of Cedar Park, Tex.*, 950 F.2d 272, 276 (5th Cir. 1992). Thereafter, "the burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact." *Hamilton v. Seque Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (quoting *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)). To survive a properly supported motion for summary judgment, a section

1983 plaintiff must demonstrate, in light of "the substantive evidentiary standard of proof that would apply at the trial on the merits," that "a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The Court may grant summary judgment on any ground supported by the record, even if the ground is not raised by the movant. *U.S. v. Houston Pipeline Co.*, 37 F.3d 224, 227 (5th Cir. 1994).

III. DISCUSSION

A. Municipal Immunity

Counties and county supervisors, like Sheriff Wright, are not liable for constitutional violations committed by county employees unless those violations result directly from a municipal custom or policy. *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Therefore, in order to hold Fort Bend County liable or Sheriff Wright liable in his official capacity, plaintiff must show that his constitutional deprivation was caused by the County's adoption of (or failure to adopt) a particular policy, and that such action went beyond mere negligent protection of the plaintiff's constitutional rights. *Hare v. City of Corinth, Miss.*, 74 F.3d 633 (5th Cir. 1996). That is, an alleged inadequacy in a Fort Bend County policy must amount to "an intentional choice, not merely an unintentionally negligent oversight." *Id.*

When analyzing a section 1983 claim against a municipality, the Court must first decide if the County promulgated "an official policy, practice, or custom," which could subject it to § 1983 liability. *Monell v. Dept. Soc. Servs. City New York*, 436 U.S. 658, 690-94 (1978). The Fifth Circuit has defined an "official policy" for the purposes of § 1983 liability to be either a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's law-making officers or by an official to whom the lawmakers have delegated policy-making authority, or a persistent widespread practice of county officials or employees,

3

which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984).

Plaintiff alleges no facts that would give rise to an "official policy" under these definitions. Plaintiff simply fails to allege any policy or lack thereof to establish a claim of constitutional violations against the County. Moreover, defendants' summary judgment record contains a copy of the Fort Bend County Jail's comprehensive policy with respect to inmate and detainee medical care and the affidavit of Captain William Fortenberry, who was in charge of the Detention Division of the Fort Bend County Sheriff's Office during plaintiff's detention. (Docket Entry No.16). The official policy provides for treatment of a detainee's medical needs. (*Id.*). Moreover, Captain Fortenberry attests that he has never observed any custom to exist under which medical treatment has ever been denied to any inmate at the Fort Bend County Jail, nor observed any custom or practice of violating any departmental policies. (*Id.*, page 7). Plaintiff presents no evidence to contravene defendants' summary judgment evidence. Accordingly, plaintiff fails to state a claim against Fort Bend County, Texas, or against Sheriff Milton Wright, in his official capacity. Plaintiff's claims against Fort Bend County, Texas, and Sheriff Wright, in his official capacity, are subject to dismissal.

B. Qualified Immunity

Qualified immunity shields government officials performing discretionary functions "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). "Whether a defendant asserting qualified immunity may be personally liable turns on the objective

legal reasonableness of the defendant's actions assessed in light of clearly established law." *Fraire v. City of Arlington*, 957 F.2d 1268, 1272 (5th Cir. 1992).

"The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the allegations establish a constitutional violation, the court next considers whether the defendants' actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope*, 536 U.S. at 739 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense. *McClendon v. City of Columbia*, 305 F.3d 314, 322 (5th Cir. 2002). Qualified immunity constitutes an immunity from suit, thereby, protecting defendants from trial and the burdens of pre-trial matters such as discovery. *Id.* at 323. For this reason, adjudication of qualified immunity claims must occur "'at the earliest possible stage in litigation.'" *Id*. (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1996)).

Although plaintiff claims that Sheriff Wright and the nursing staff at the Fort Bend County Jail deliberately delayed medical treatment for his hand in violation of the Eighth Amendment, his pleadings fail to state facts that would show that Sheriff Wright was personally involved in the alleged denial of medical care as required under 42 U.S.C. § 1983. *See Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) (holding personal involvement in alleged constitutional deprivation is an essential element of a civil rights cause of action). Section 1983 does not create supervisory or *respondeat superior* liability. *See Alton v. Texas A & M Univ.*, 168 F.3d 196, 200 (5th Cir.

1999). Individual officials may be liable only for implementing a policy that is "'itself a repudiation of constitutional rights' and 'the moving force of the constitutional violation.'" *Oliver*, 276 F.3d at 742 (quoting *Grandstaff v. City of Borger*, 767 F.2d 161, 169, 170 (5th Cir. 1985)). Plaintiff's pleadings fail to identify specific policies or state specific facts to show that defendant Wright implemented a policy with respect to the allegedly unconstitutional conditions of confinement.

Alternatively, plaintiff's medical records do not support plaintiff's allegations that defendants did not provide him with adequate medical care for his injured hand.

A pretrial detainee's constitutional rights flow from the procedural and substantive due process guarantees of the Fourteenth Amendment. *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999). To analyze a claim under the Due Process Clause of the Fourteenth Amendment, a court must first determine whether the claim is an attack on a condition of confinement or an episodic act or omission. *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (en banc). The former category includes claims such as the number of bunks in a cell or television privileges, while the latter occurs "where the complained-of-harm is a particular act or omission of one or more officials." *Id.* Plaintiff's claims fall into the latter category.

A state law enforcement official's constitutional liability to a pretrial detainee for episodic acts or omissions is measured by a standard of subjective deliberate indifference as enunciated by the Supreme Court in *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). *Hare*, 74 F.3d at 643. "Subjective deliberate indifference" means subjective knowledge of a substantial risk of serious medical harm, followed by a response of deliberate indifference. *Id.* at 650. "Deliberate indifference encompasses only the unnecessary and wanton infliction of pain repugnant to the conscience of mankind." *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997). A law

enforcement official's "failure to alleviate a significant risk that [the official] should have perceived, but did not" is insufficient to show deliberate indifference. *Farmer*, 511 U.S. at 838. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id.* at 838; *Hare*, 74 F.3d at 648. A pre-trial detainee, however, need not show that a law enforcement official acted, or failed to act, believing that harm actually would befall him; it is enough that the official acted, or failed to act, despite his knowledge of a substantial risk of serious harm. *Farmer*, 511 U.S. at 842-43; *see Hare*, 74 F.3d at 648-50. Under certain exceptional circumstances, a law enforcement official's knowledge of a substantial risk of harm may be inferred by the obviousness of the risk. *Farmer*, 511 U.S. at 843 and n. 8.

Plaintiff claims that jail personnel were deliberately indifferent to his serious injury to his left hand because they did not initiate treatment for the hand jury until he complained. (Docket Entry No.31). Plaintiff's medical records show, as Captain Fortenberry attests, that law enforcement and medical personnel at the Fort Bend County Jail were aware of plaintiff's need for orthopedic care for his left hand but they were also aware of plaintiff's serious heart condition and other medical conditions. Plaintiff's medical records reflect that Fort Bend County Jail officials attempted to provide medical services for all of plaintiff's conditions, including his injured hand. The record shows that additional surgery on plaintiff's injured hand was not performed while he was detained in the Fort Bend County Jail because of plaintiff's other serious medical conditions. Although plaintiff complains that the physician's notes[1] following his first physical examination at the Richmond Bone & Joint Clinic are missing (Docket Entry No.31), deposition testimony

---

[1] Plaintiff claims that Dr. Carlyle expressed dis-satisfaction with Fort Bend County's delay in seeking treatment for his hand at this examination. (Docket Entry No.29, Part 33, pages 19-20).

attached to the Clinic's record shows that the record is complete. (Docket Entry No.29, Part 33, pages 5-7). The record shows that plaintiff's other serious medical conditions prevented additional hand surgery. The record does not show, and plaintiff fails to provide any evidence to show, that Fort Bend County officials were deliberately indifferent to plaintiff's serious medical needs.[2]

---

[2] Plaintiff was admitted to Memorial Hermann Hospital's Emergency Center on July 24, 2002, with multiple wounds to his abdomen and left hand. (Docket Entry No.29, Part 1, page 28). Hospital records show that plaintiff was fifty-nine years old, that he robbed a bank and was involved in a hostage situation at his house, and that he was shot by a SWAT team. (*Id.*). On August 2, 2002, plaintiff was discharged to the Fort Bend County Jail infirmary. (*Id.*, Part 2, page 2). Unlike plaintiff's allegation that he was to return to Hermann Hospital in six weeks, discharge notes reflect that plaintiff was to receive follow-up care in the Fort Bend County surgery clinic and a Fort Bend County plastic surgery clinic for his hand. (*Id.*, page 3). During transport to the jail, plaintiff developed a sudden shortness of breath with chest pain and was returned to the emergency room for evaluation. (*Id.*, Part 7, page 37). After he was stabilized, he was discharged to the jail on August 17, 2002. (*Id.*, page 38). He was to follow-up with the attending emergency room doctor in two weeks. (*Id.*). On August 19, 2002, two days after he was admitted to the jail, plaintiff returned to Hermann Hospital for emergency treatment related to a heart condition. (*Id.*, Part 15, page 37). He was discharged on August 24, 2002. (*Id.*). On August 27, 2002, three days later, plaintiff was admitted to Polly Ryon Hospital for heart problems. (*Id.*, part 34, page 30). He was discharged from Polly Ryon on August 29, 2002. (*Id.*, Part 35, pages 6-7).

Days later, on September 9, 2002, plaintiff completed an Inmate Request Form, seeking information on follow-up care for his hand. (Docket Entry No.16, Part 5, page 36). Plaintiff noted that "Herman [sic] said it needed to be worked on 6 weeks from operation." (*Id.*). An LVN noted in response that "hand surgery questionable - monitor." (*Id.*). On September 12, 2002, plaintiff submitted another request form complaining about stomach wounds. (*Id.*, page 38). On September 18, 2002, plaintiff submitted a second request for treatment for his hand. (*Id.*, page 39). He complained that

> Herman [sic] said my hand needed to be worked on in 6 weeks. That was September 5, 2002. It is now going on 8 weeks and nothing. One pin has been pulled. It hurts and looks infected around the pin. I have been asking and told I am scheduled for 2 weeks now. That may be true but if it is 3 weeks from now won't help me. If that is the case the pain is to [sic] great and it hurts around the pin. Not one person has looked at it since I was placed in jail.
>
> Herman [sic] was ready to work on it Sept. [sic] 5 or about. If it is not being taken care of why can not Herman [sic] work it and finish the hand in the way and time it should have been. I worry about the lose [sic] of my finger. My finger is red and inflamed. It doesn't take a Dr[.] or RN to tell it is bad.

(*Id.*, page 40). Plaintiff filed another inmate medical request complaining that it had been over a month since doctors at Hermann Hospital told him that work on the fingers needed to be done. (*Id.*, Part 16, page 2). Plaintiff complained that his finger was infected, that one pin had fallen out, and that he was in pain. (*Id.*). He noted that he had seen a doctor at the indigent clinic two weeks ago and that doctor had referred him to someone else. (*Id.*, page 3). A response dated October 8, 2002 reflects that a referral to an orthopedic clinic was pending. (*Id.*, page 2).

Conclusion

Based on the foregoing, the Court ORDERS the following:

1. Defendants are entitled to summary judgment as a matter of law. Accordingly, the Order entered December 15, 2005 (Docket Entry No.27), denying defendants' motion for summary judgment is VACATED. All other orders, entered on December 15, 2006 remain in effect.

2. Defendants' motion for summary judgment (Docket Entry No.15) is GRANTED.

---

On October 16, 2002, plaintiff was seen by Dr. Carlyle, an orthopedic doctor, at the Richmond Bone & Joint Clinic. (Docket Entry No.29, Part 33, pages 10-11). Although the physician's notes of this first appointment are not included in the record, the medical transportation summary sheet shows Dr. Carlyle's assessment and orders following the examination. (*Id.*, page 10). On the sheet, Dr. Carlyle indicated that plaintiff would need reconstructive surgery for his finger fractures and that his office would call to schedule surgery. (*Id.*). Later that same day, plaintiff was taken from his jail cell to Polly Ryon Memorial Hospital after he experienced an episode of dizziness and chest pains. (*Id.*, Part 37, page 2). He was discharged on October 21, 2002, and transferred to Hermann Hospital, where on October 29, 2002 (*id.*, pages 2-3), he underwent coronary by-pass graft surgery. (*Id.*, Part 18, page 25). Plaintiff was discharged on November 6, 2002. (*Id.*).

On November 15, 2002, plaintiff saw Dr. Carlyle for a follow-up visit. (*Id.*, page 12). Dr. Carlyle noted plaintiff's heart condition. He also noted that "[e]xamination of his hand reveals minimal change in the interval." (*Id.*). He further noted that plaintiff had active extension of the ring and middle fingers and that plaintiff's wounds had healed well. (*Id.*). Dr. Carlyle observed that plaintiff was concerned about the lack of motion of his fingers. (*Id.*). He advised plaintiff to seek the attention of a hand surgeon if he gets out of jail on bond; otherwise, Dr. Carlyle indicated that he could possibly fix the hand in January, 2003. (*Id.*). Dr. Carlyle stated that he "would like to wait for a period of time until [plaintiff's] coronary artery disease problems have been stabilized." (*Id.*). In his follow-up orders on the Medical Transport Summary, Dr. Carlyle noted "[n]o surgery for two months as pt [sic] at grave risk for recurrent heart disease." (*Id.*, page 13).

At a consultation in January of 2003, Dr. Carlyle noted that plaintiff reported that his fingers were feeling better although he still has some stiffness and pain. (*Id.*, page 14). Carlyle observed that plaintiff had near full extension of his MCP joints. Carlyle stated that he believed that plaintiff was improving in his range of motion and ordered him to squeeze a ball to improve strength and motion. He set another follow-up appointment six weeks later. (*Id.*).

Following the next appointment on February 24, 2003, Dr. Carlyle reported that plaintiff's range of motion had decreased and that plaintiff complained of more pain. Dr. Carlyle attributed these changes to some arthritic changes in the fingers and recent cold weather. (*Id.*, page 17). Carlyle stated, "As I have stated from the beginning, I feel the patient would benefit from visit to a hand specialist for possible reconstruction of his metacarpals. I do not feel that I am qualified to adequately perform any surgery on this gentleman." (*Id.*).

3.      Plaintiff's civil rights complaint is DISMISSED, WITH PREJUDICE.

4.      All other pending motions, if any, are DENIED.

The Clerk shall provide a copy of this Order to the parties.

Signed at Houston, Texas, this 21st day of September, 2006.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE